# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 15, 2016      Decided September 29, 2017

No. 15-1202

FRANCIS V. LORENZO,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of
the Securities & Exchange Commission

*Robert G. Heim* argued the cause for petitioner.  With him on the briefs were *Stephanie Rapp-Tully* and *Steven L. Herrick.*

*Martin V. Totaro*, Attorney, Securities and Exchange Commission, argued the cause for respondent.  On the brief were *Anne K. Small*, General Counsel, *Michael A. Conley*, Solicitor, and *Benjamin L. Schiffrin*, Senior Litigation Counsel.

Before: GRIFFITH, KAVANAUGH, and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

2

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

SRINIVASAN, *Circuit Judge*: The Securities and Exchange Commission found that Francis Lorenzo sent email messages to investors containing misrepresentations about key features of a securities offering. The Commission determined that Lorenzo's conduct violated various securities-fraud provisions. We uphold the Commission's findings that the statements in Lorenzo's emails were false or misleading and that he possessed the requisite intent.

We cannot sustain, however, the Commission's determination that Lorenzo's conduct violated one of the provisions he was found to have infringed: Rule 10b-5(b). That rule bars the making of materially false statements in connection with the purchase or sale of securities. We conclude that Lorenzo did not "make" the false statements at issue for purposes of Rule 10b-5(b) because Lorenzo's boss, and not Lorenzo himself, retained "ultimate authority" over the statements. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

While Lorenzo's boss, and not Lorenzo, thus was the "maker" of the false statements under Rule 10b-5(b), Lorenzo played an active role in perpetrating the fraud by folding the statements into emails he sent directly to investors in his capacity as director of investment banking, and by doing so with an intent to deceive. Lorenzo's conduct therefore infringed the other securities-fraud provisions he was charged with violating. But because the Commission's choice of sanctions to impose against Lorenzo turned in some measure on its misimpression that his conduct violated Rule 10b-5(b), we set aside the sanctions and remand the matter to enable the Commission to reassess the appropriate penalties.

3

I.

A.

In February 2009, Francis Lorenzo became the director of investment banking at Charles Vista, LLC. Charles Vista was a registered broker-dealer owned by Gregg Lorenzo, no relation to Francis. (For clarity of reference, we will refer to Francis Lorenzo as "Lorenzo" and will use Gregg Lorenzo's first name when referring to him.)

Charles Vista's biggest client, and Lorenzo's only investment-banking client at the time, was a start-up company named Waste2Energy Holdings, Inc. (W2E). W2E claimed to have developed a "gasification" technology that could generate electricity by converting solid waste to gas. W2E's business model relied on the technology's living up to its potential. If it failed to do so, the great majority of W2E's assets—the "intangibles," in balance-sheet lingo—would have to be written off entirely.

W2E's conversion technology never materialized. In September 2009, W2E sought to escape financial ruin by offering up to $15 million in convertible debentures. (Debentures are "debt secured only by the debtor's earning power, not by a lien on any specific asset." BLACK'S LAW DICTIONARY 486 (10th ed. 2014)). Charles Vista would serve as the exclusive placement agent for W2E's debenture offering.

W2E's most recent SEC filing at the time, its June 3, 2009 Form 8-K (used to notify investors of certain specified events), contained no indication of any possible devaluation of the company's intangible assets. Rather, the form stated that W2E's intangibles were worth just over $10 million as of

the end of 2008. On September 9, 2009, W2E issued a Private Placement Memorandum as a guidebook for potential investors in the debentures. That guidebook, like the June 2009 Form 8-K, included no mention of any devaluation of the company's intangibles.

Following a lengthy audit, however, W2E changed its public tune. On October 1, 2009, the company filed an amended Form 8-K in which it reported a total "impairment" of its intangible assets because "management made a determination that the value of the assets acquired were of no value." J.A. 703. As of March 31, 2009, W2E now clarified, its gasification technology should have been valued at *zero*, and its total assets at only $370,552. On the same day it filed its amended Form 8-K, October 1, 2009, W2E also filed a quarterly Form 10-Q in which it valued its total assets at $660,408 as of June 30, 2009.

Later on October 1, Lorenzo's secretary alerted him (via email) about W2E's amended Form 8-K filing. The next day, Lorenzo emailed all Charles Vista brokers links to both of W2E's October 1 filings. On October 5, he received an email from W2E's Chief Financial Officer explaining the reasons for "[t]he accumulated deficit we have reported." *Id.* at 740. The CFO reiterated that W2E had written off "all of our intangible assets . . . of about $11 million" due to "our assessment of the value of what those asset[s] are worth today." *Id.*

On October 14, Lorenzo separately emailed two potential investors "several key points" about W2E's pending debenture offering. *Id.* at 794, 796. His emails, however, omitted any mention of the wholesale devaluation of W2E's intangibles. On the contrary, Lorenzo's emails assured both recipients that the offering came with "3 layers of protection:

(I) [W2E] has over $10 mm in confirmed assets; (II) [W2E] has purchase orders and LOI's for over $43 mm in orders; (III) Charles Vista has agreed to raise additional monies to repay these Debenture holders (if necessary)." *Id.* One of Lorenzo's messages said it had been sent "[a]t the request of Gregg Lorenzo," *id.* at 796, and the other stated it had been sent "[a]t the request of Adam Spero [a broker with Charles Vista] and Gregg Lorenzo," *id.* at 794. In both messages, Lorenzo urged the recipients to "[p]lease call [him] with any questions." *Id.* at 794, 796. And he signed both messages with his name and title as "Vice President – Investment Banking." *Id.*

B.

On February 15, 2013, the Commission commenced cease-and-desist proceedings against Lorenzo, Gregg Lorenzo, and Charles Vista. It charged each with violating three securities-fraud provisions: (i) Section 17(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(1); (ii) Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; and (iii) Securities Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5. Gregg Lorenzo and Charles Vista settled the charges against them, but the claims against Lorenzo proceeded to resolution before the agency.

An administrative law judge concluded that Lorenzo had "willfully violated the antifraud provisions of the Securities and Exchange Acts by his material misrepresentations and omissions concerning W2E in the emails." *Gregg C. Lorenzo, Francis V. Lorenzo, and Charles Vista, LLC*, SEC Release No. 544, 107 SEC Docket 5934, 2013 WL 6858820, at *7 (Dec. 31, 2013). The ALJ deemed "[t]he falsity of the representations in the emails . . . staggering" and Lorenzo's mental state with respect to those misstatements at least

"reckless." *Id.* As a result, the ALJ ordered Lorenzo to: (i) cease and desist from violating each securities-fraud provision giving rise to the charges against him; (ii) forever refrain from participating in the securities industry in several enumerated respects; and (iii) pay a civil monetary penalty of $15,000. *Id.* at *10.

Lorenzo petitioned the Commission for review. Following "an independent review of the record," the full Commission sustained the ALJ's decision, including her "imposition of an industry-wide bar, a cease-and-desist order, and a $15,000 civil penalty." *Francis V. Lorenzo*, SEC Release No. 9762, 111 SEC Docket 1761, 2015 WL 1927763, at *1 (Apr. 29, 2015) (*Lorenzo*). The Commission found that Lorenzo "knew each of [the emails' key statements] was false and/or misleading when he sent them." *Id.* It concluded that the sanctions were "in the public interest to deter Lorenzo and others in similar positions from committing future violations." *Id.* at *17. The Commission later denied Lorenzo's motion for reconsideration.

Lorenzo filed a timely petition for review in this court. He challenges only the Commission's imposition of an industry-wide bar and a $15,000 civil penalty, not the cease-and-desist order.

## II.

We first consider Lorenzo's challenges to the Commission's findings that the relevant statements in his email messages were false or misleading and were made with the requisite mental state. The three pertinent statements are the three "layers of protection" enumerated in both of Lorenzo's October 14, 2009, email messages to potential investors about the debenture offering. Lorenzo challenges

the Commission's determination that two of the three statements were false or misleading, and he also challenges the Commission's conclusion that he possessed the requisite intent with respect to all three of the statements.

With regard to his intent, establishing a violation of Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, or Exchange Act Rule 10b-5 "requires proof of scienter." *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008). That standard in turn requires demonstrating "an intent to deceive, manipulate, or defraud." *Id.* (quoting *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992)). The scienter requirement can be satisfied by a showing of "[e]xtreme recklessness," which exists when "the danger was so obvious that the actor was aware of it and consciously disregarded it." *Id.*

The question whether Lorenzo acted with scienter, like the question whether the statements were false or misleading, is a question of fact. *Id.* at 639. The Commission's "factual findings are conclusive if supported by substantial evidence." *Seghers v. SEC*, 548 F.3d 129, 132 (D.C. Cir. 2008). Although "[s]ubstantial evidence is more than a mere scintilla," *Kornman v. SEC*, 592 F.3d 173, 184 (D.C. Cir. 2010), we have repeatedly described the standard as a "very deferential" one, *e.g.*, *Siegel v. SEC*, 592 F.3d 147, 155 (D.C. Cir. 2010); *Dolphin & Bradbury*, 512 F.3d at 639; *Nat'l Ass'n of Sec. Dealers v. SEC*, 801 F.2d 1415, 1419 (D.C. Cir. 1986). Applying that standard here, we conclude that the Commission's findings as to falsity and scienter are supported by substantial evidence with regard to each of the three pertinent statements in Lorenzo's emails.

8

A.

The first of the three statements at issue advised potential investors that the "Company has over $10 mm in confirmed assets." J.A. 794, 796. Lorenzo does not directly dispute the falsity of that statement. Nor could he: by the time Lorenzo sent the October 14, 2009, email messages containing that statement, W2E had entirely written off its intangibles and disclosed that its remaining assets were worth far less than $1 million. And Lorenzo himself testified that W2E "would be lucky to get a million" for its intangibles after they had been marked down. *Id.* at 128.

As to the question of scienter, Lorenzo contends that, when he sent the emails, he held a good-faith belief that W2E had over $10 million in confirmed assets. The Commission concluded otherwise, and its finding of scienter is supported by substantial evidence.

One of Lorenzo's chief duties involved conducting due diligence on his clients, including reviewing their financial statements and public SEC filings. During the relevant time, W2E was Lorenzo's sole investment-banking client. He knew that W2E's financial situation was "horrible from the beginning" and that its gas-conversion technology had not worked as planned. *Id.* at 124. He also knew that he stood to gain seven to nine percent of any funds he raised from the debenture offering.

The record shows that, when Lorenzo viewed W2E's June 2009 Form 8-K, he disbelieved the Form's valuation of the company's intangible assets at $10 million. He agreed that the intangibles were a "dead asset" that would be "hugely discounted," *id.* at 127-28, and that W2E would be "lucky [to] get a million dollars for that asset," *id.* at 128-29. He also

thought it significant that the $10 million valuation had not been audited, because without such scrutiny, "there is way too much risk for investors." *Id.* at 126. He acknowledged that he had warned Gregg Lorenzo as early as April 2009 to refrain from collateralizing a debenture offering with W2E's intangibles, because those assets "provided no protection" to investors. *Id.* at 159. Lorenzo understood that, if a default occurred, "clients would not be able to recoup their money based on a liquidation of this asset." *Id.* He instead viewed the debenture offering as a "toxic convertible debt spiral." *Lorenzo*, 2015 WL 1927763, at *5.

Evidence concerning Lorenzo's state of mind can also be gleaned from his actions in helping prepare Charles Vista's Private Placement Memorandum for the debenture offering. On August 26, 2009, he asked W2E's principals to value the company's intangibles at $10 million in the upcoming Memorandum. He received no response. He broached the subject again on September 1, this time leaving the intangibles' value blank, because he "w[asn't] sure what [it] was worth anymore." J.A. 135, 739. The final Memorandum assigned no concrete value to W2E's intangibles; it instead divulged that the company had experienced "significant operating losses" and did "not expect to be profitable for at least the foreseeable future." *Lorenzo*, 2015 WL 1927763, at *3.

In its October 1 SEC filings, W2E publicly disclosed the wholesale write-off of its intangibles. It did so in a tri-column chart entitled "Goodwill and Technology," and it followed that numerical presentation with a textual explanation for the mark-down. Lorenzo acknowledged that he read the amended Form 8-K on October 1 (although, according to him, "[p]robably not as closely as I should have"). J.A. 140. And he received an email from W2E's CFO on October 5

succinctly contextualizing the massive devaluation of W2E's intangible assets.

The evidence therefore supports concluding that, at least by October 5, Lorenzo knew that W2E's intangibles were valueless. He gave testimony on the issue as follows: "Q. So it is fair to say . . . that on October 5, 200[9], you were aware that the $10 million asset had been written off by [W2E]. Correct? A. Okay. I will agree to that. That's correct. Q. That is a fair statement? A. Yes." *Id.* at 151. That admission is difficult to reconcile with Lorenzo's statement that he "unintentional[ly] miss[ed]" the import of the October 5 email. *Id.* at 148. The Commission justifiably credited his more inculpatory rendition of events, especially in light of his broader, scienter-related concession: "Q. [D]id you know that those statements were inaccurate and misleading? A. Yes. Q. You knew at the time? A. At the time? I can't sit here and say that I didn't know." *Id.* at 158.

According to the Commission, "[t]hat Lorenzo could have looked at [W2E's] filings, which was his job, and missed what was one of the most pertinent facts in them—the valuation of the company's assets—is either untrue or extreme recklessness." *Lorenzo*, 2015 WL 1927763, at *9. The Commission considered it "at least extremely reckless" for Lorenzo to have sent email messages claiming that W2E had over $10 million in "confirmed" assets, given his "long-standing concern about the legitimacy" of those assets. *Id.* We perceive no basis for setting aside the Commission's conclusions as unsupported by substantial evidence.

In resisting that conclusion, Lorenzo relies in part on a $14 million valuation of W2E's assets in a W2E research report emailed by Charles Vista's Chief Compliance Officer to the firm's brokers on the same day Lorenzo sent his

pertinent emails (October 14, 2009). The Commission sensibly reasoned that "the mere fact that, for whatever unknown reason, a compliance officer sent an inaccurate research report internally to the firm's brokers is neither analogous to, nor an excuse for, Lorenzo's knowingly sending misleading emails to prospective investors." *Id.* at *9 n.23.

B.

The second contested statement is the assertion in Lorenzo's emails that "[t]he Company has purchase orders and LOI's for over $43 mm in orders." J.A. 794, 796. He maintains that the Commission erred in deeming that statement false or misleading. He notes that, at one point, Charles Vista did in fact receive a $43 million letter of intent from a potential customer in the Caribbean, and that W2E's CEO "put a lot of confidence" in such letters. *Id.* at 160. But as the Commission rightly notes, the Caribbean letter did not obligate its drafter to do anything, and the transaction proceeded no further. By the time Lorenzo sent his emails on October 14, 2009, W2E had no outstanding purchase orders. Lorenzo's emails nonetheless assured the recipients that W2E had over $43 million in "purchase orders *and* LOI's." The Commission thus was fully justified in finding that statement false or misleading. *See Lorenzo*, 2015 WL 1927763, at *6.

Lorenzo also disputes the Commission's finding of scienter concerning the extent of W2E's anticipated cash flow. Asked whether he knew at the time that the $43 million figure was misleading, Lorenzo testified as follows: "I can't say that with a hundred percent because they did have LOI's for 43 million." J.A. 160. As his other testimony revealed, however, Lorenzo understood that W2E's sole letter of intent was "non-binding," a mere potentiality that the company "hoped would materialize." *Id.* at 162. And by September

2009, he "didn't think that the 43 million LOI was ever going to turn into purchases." *Id.* at 164. Lorenzo testified repeatedly to that effect. *See id.* at 163-64 ("Q. And by September 2009 you didn't think it was ever going to come through, right? A. . . . That is correct."); *id.* at 164 ("Q. So sometime in September you lost confidence that this 43 million was ever going to happen? A. Yes.").

The clear implication of the statement in Lorenzo's email messages was that W2E anticipated a $43 million influx of capital from past and future orders. Yet the record reveals grave doubts on Lorenzo's part that "$43 mm in orders" (or *any* orders) would actually occur. Substantial evidence therefore supports the Commission's finding of scienter as to that statement.

## C.

The third statement at issue is the assertion in Lorenzo's email messages that "Charles Vista has agreed to raise additional monies to repay these Debenture holders (if necessary)." *Id.* at 794, 796. Lorenzo disputes the Commission's conclusion that the statement was false or misleading. He contends that Gregg Lorenzo could have made such an agreement for Charles Vista, had done so on prior occasions for debenture holders, and had allegedly met with additional brokers about raising funds for W2E. The Commission permissibly regarded those assertions as "establish[ing] only the theoretical possibility that Charles Vista could have raised additional money to repay investors, not that it had agreed to do so (as Lorenzo's emails claimed)." *Lorenzo*, 2015 WL 1927763, at *7.

With regard to scienter, Lorenzo observes that the Commission included no specific citations to the record in

support of its finding. It is true that, although the Commission quoted the evidentiary record at length, it did not cite the particular page numbers on which certain arguments and quotations appeared. But we "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)). That standard is readily satisfied here.

Lorenzo allowed, at least in hindsight, that "you can interpret this [statement] as being misleading." J.A. 167. Moreover, according to his own testimony, at the time he sent the emails, he did not believe Charles Vista could raise enough money to repay debenture holders. For instance, he testified that, as of October 2009, "it is accurate to say that Charles Vista would not have the buying power or the resources to properly fund [W2E] in order to repay the debentures." *Id.* at 172. Given Lorenzo's knowledge that Charles Vista could not have repaid debenture holders, the Commission could certainly conclude that Lorenzo believed that no such agreement existed. As a result, substantial evidence supports the Commission's finding that Lorenzo acted with scienter with regard to the assurance to investors that Charles Vista had made such a promise.

### III.

The Commission found that Lorenzo's actions in connection with his email messages violated Section (17)(a)(1) of the Securities Act and Section 10(b) of the Exchange Act, as implemented by the Commission's Rule 10b-5. The Rule contains three subsections, and the Commission concluded that Lorenzo had violated all three.

We now consider Lorenzo's argument that he did not "make" the relevant statements within the meaning of the express terms of one of Rule 10b-5's subsections, Rule 10b-5(b). We agree with Lorenzo that, under the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), he did not "make" the statements at issue for purposes of Rule 10b-5(b). Even so, we conclude that his status as a non-"maker" of the statements under Rule 10b-5(b) does not vitiate the Commission's conclusion that his actions violated the other subsections of Rule 10b-5, as well as Section 17(a)(1).

A.

Under Rule 10b-5(b), it is unlawful to "make any untrue statement of a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). In *Janus*, the Supreme Court explained what it means to "make" a statement within the meaning of that prohibition:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker.

564 U.S. at 142. "[I]n the ordinary case," the Court continued, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* at 142-43.

The *Janus* Court held that an investment adviser that had assisted in preparing a mutual fund's prospectuses did not "make" the statements contained therein, because the adviser lacked "ultimate control" over the statements' content and dissemination. *Id.* at 148. The investment adviser had merely "participate[d] in the drafting of a false statement"—"an undisclosed act preceding the decision of an independent entity to make a public statement." *Id.* at 145. The Court illustrated the operation of its test through the following analogy: "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said." *Id.* at 143.

Under the *Janus* test, a person cannot have "made" a statement if he lacked ultimate authority over what it said and whether it was said, including if he prepared or published it on behalf of another. In light of that understanding, we find that Lorenzo was not the "maker" of the pertinent statements set out in the email messages he sent to potential investors, even viewing the record in the light most favorable to the Commission.

Lorenzo contends that he sent the email messages at the behest of his boss, Gregg Lorenzo, and that Gregg Lorenzo supplied the content of the false statements, which Lorenzo copied and pasted into the messages before distributing them. As a result, Lorenzo contends, Gregg Lorenzo (and not Lorenzo himself) was the "maker" of the statements under *Janus*. The Commission found otherwise, concluding that Lorenzo "was ultimately responsible for the emails' content and dissemination." *Lorenzo*, 2015 WL 1927763, at \*10. We cannot sustain the Commission's conclusion that Lorenzo had "ultimate authority" over the false statements under *Janus*.

564 U.S. at 142.  Gregg Lorenzo, and not Lorenzo, retained ultimate authority.

Voluminous testimony established that Lorenzo transmitted statements devised by Gregg Lorenzo at Gregg Lorenzo's direction.  For instance, Lorenzo said:  "I cut and paste[d] an e-mail and sent it to [investors]," J.A. 153; "I was asked to send these e-mails out by Gregg Lorenzo," *id.* at 156; and "I cut and pasted and sent it," *id.* at 157.  He also stated: "I remember getting—getting the e-mail address from [Gregg Lorenzo] and then cut and past[ed] this—this thing and sent it," *id.* at 199; "[Gregg Lorenzo] gave me the e-mail address, I typed it into the 'to' column and cut and pasted this—the content and sent it out," *id.*; "My boss asked me to send these e-mails out and I sent them out," *id.* at 200; "[I] sent these e-mails out at the request of my superior," *id.* at 208; and "I simply was asked to send the e-mail out," *id.* at 208-09.

In the face of that consistent testimony, the Commission anchored its conclusion almost entirely in the following remark from Lorenzo:  "If memory serves me—I think I authored it and then it was approved by Gregg and Mike [Molinaro, Charles Vista's Chief Compliance Officer]."  J.A. 155.  That assertion, even apart from its equivocation, must be read alongside the rest of Lorenzo's testimony.  Immediately before and after uttering that line, Lorenzo explained that "I cut and paste[d] an e-mail and sent it" and "I cut and pasted and sent it."  *Id.* at 153, 157.  And he consistently testified to the same effect throughout.  In that light, Lorenzo's remark that he "authored" the emails cannot bear the weight given it by the Commission.  Rather, the statement is fully consistent with Lorenzo's repeated account that, while he produced the email messages for final distribution from himself to the investors—and in that sense "authored" the messages—he populated the messages with content sent by Gregg Lorenzo.

In the line of testimony on which the Commission relies, moreover, Lorenzo stated that, before he sent the messages, they were "approved" by Gregg Lorenzo. That observation reinforces Gregg Lorenzo's ultimate authority over the substance and distribution of the emails: Gregg Lorenzo asked Lorenzo to send the emails, supplied the central content, and approved the messages for distribution. To be sure, Lorenzo played an active role in perpetrating the fraud by producing the emails containing the false statements and sending them from his account in his capacity as director of investment banking (and doing so with scienter). But under the test set forth in *Janus*, Gregg Lorenzo, and not Lorenzo, was "the maker" of the false statements in the emails. 564 U.S. at 142.

The Commission's remaining observations do not alter our conclusion. For instance, the Commission noted that Lorenzo "put his own name and direct phone number at the end of the emails, and he sent the emails from his own account." *Lorenzo*, 2015 WL 1927763, at *10. That sort of signature line, however, can often exist when one person sends an email that "publishes a statement on behalf of another," with the latter person retaining "ultimate authority over the statement." *Janus*, 564 U.S. at 142.

The Commission also referenced Lorenzo's testimony that "he did not recall ever discussing either of the emails or their subject matter with Gregg Lorenzo." *Lorenzo*, 2015 WL 1927763, at *10. That comment, however, is consistent with the understanding that Lorenzo played a minimal role in devising the emails' false statements. And although the email messages said that the Investment Banking Division—which Lorenzo headed—was "summariz[ing] several key points" about the debenture offering, J.A. 794, 796, the content of those points evidently had been supplied by Gregg Lorenzo.

The emails, moreover, began by stating that they were being sent at Gregg Lorenzo's request. Lorenzo testified elsewhere that Gregg Lorenzo had remarked, "I want this [to] come from our investment banking division. Can you send this out for me?" *Id.* at 217.

Under the Supreme Court's decision in *Janus*, in short, Lorenzo cannot be considered to have been "the maker" of the statements in question for purposes of Rule 10b-5(b)—i.e., "the person . . . with ultimate authority" over them. 564 U.S. at 142. That person was Gregg Lorenzo, and not (or not also) Lorenzo.

## B.

Lorenzo next argues that, if he was not "the maker" of the false statements at issue within the meaning of Rule 10b-5(b), his conduct necessarily also falls outside the prohibitions of Exchange Act Section 10(b), Rules 10b-5(a) and (c), and Securities Act Section 17(a)(1). The Commission concluded otherwise, incorporating by reference its reasoning in *John P. Flannery & James D. Hopkins*, SEC Release No. 3981, 110 SEC Docket 2463, 2014 WL 7145625 (Dec. 15, 2014), *vacated*, *Flannery v. SEC*, 810 F.3d 1 (1st Cir. 2015) (rejecting the Commission's key factual determinations on substantial-evidence grounds). The Commission determined that, "[i]ndependently of whether Lorenzo's involvement in the emails amounted to 'making' the misstatements for purposes of Rule 10b-5(b), he knowingly sent materially misleading language from his own email account to prospective investors," thereby violating those other provisions. *Lorenzo*, 2015 WL 1927763, at *11.

We sustain the Commission's conclusion to that effect. At least in the circumstances of this case, in which Lorenzo

produced email messages containing false statements and sent them directly to potential investors expressly in his capacity as head of the Investment Banking Division—and did so with scienter—he can be found to have infringed Section 10(b), Rules 10b-5(a) and (c), and Section 17(a)(1), regardless of whether he was the "maker" of the false statements for purposes of Rule 10b-5(b).

1. Rules 10b-5(a) and (c), along with Sections 10(b) and 17(a)(1)—all unlike Rule 10b-5(b)—do not speak in terms of an individual's "making" a false statement. Indeed, "[t]o make any . . . statement" was the critical language construed in *Janus*: what the Court described as the "phrase at issue." 564 U.S. at 142 (alteration in original) (quoting 17 C.F.R. § 240.10b-5(b)). That language appears in Rule 10b-5(b), but not in the other provisions Lorenzo was found to have violated.

In particular, Rule 10b-5(a) prohibits "employ[ing] any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a). And Rule 10b-5(c) bars "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . in connection with the purchase or sale of any security." *Id.* § 240.10b-5(c). Consequently, Rule 10b-5(b) "specifies the making of an untrue statement of a material fact and the omission to state a material fact. The first and third subparagraphs are not so restricted." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152-53 (1972).

Nor are Securities Act Section 17(a)(1) and Exchange Act Section 10(b). Section 17(a)(1) makes it unlawful "to employ any device, scheme, or artifice to defraud" in offering or selling a security. 15 U.S.C. § 77q(a)(1). And Section

10(b) forbids "us[ing] or employ[ing] . . . any manipulative or deceptive device or contrivance" in contravention of rules prescribed by the Commission. 15 U.S.C. § 78j(b).

Here, Lorenzo, acting with scienter (i.e., an intent to deceive or defraud, or extreme recklessness to that effect), produced email messages containing three false statements about a pending offering, sent the messages directly to potential investors, and encouraged them to contact him personally with any questions. Although Lorenzo does not qualify as the "maker" of those statements under *Janus* because he lacked ultimate authority over their content and dissemination, his own active "role in producing and sending the emails constituted employing a deceptive 'device,' 'act,' or 'artifice to defraud' for purposes of liability under Section 10(b), Rule 10b-5(a) and (c), and Section 17(a)(1)." *Lorenzo*, 2015 WL 1927763, at *11.

Lorenzo's conduct fits comfortably within the ordinary understanding of those terms. Indeed, he presents no argument that his actions fail to satisfy the statutory and regulatory language. He does not examine—or even reference—the text of those provisions in arguing that they should be deemed not to apply to his conduct.

Lorenzo does not contend before us, for instance, that he simply passed along information supplied by Gregg Lorenzo without pausing to think about the truth or falsity of what he was sending to investors. If those were the facts, he might attempt to argue that he cannot be considered to have "employed" any fraudulent device or artifice, or "engaged" in any fraudulent or deceitful act, within the meaning of Rules 10b-5(a) and (c), and of Sections 10(b) and 17(a)(1). But while Lorenzo argued before the Commission that he produced and sent the emails at Gregg Lorenzo's request

without giving them thought, the Commission found "implausible" any suggestion that he merely passed along the messages in his own name without thinking about their content. *Lorenzo*, 2015 WL 1927763, at *9. Lorenzo does not challenge that finding here.

We therefore consider the case on the understanding that Lorenzo, having taken stock of the emails' content and having formed the requisite intent to deceive, conveyed materially false information to prospective investors about a pending securities offering backed by the weight of his office as director of investment banking. On that understanding, the language of Sections 10(b) and 17(a)(1), and of Rules 10b-5(a) and (c), readily encompasses Lorenzo's actions.

2. Instead of presenting any argument that his conduct falls outside the language of those provisions, Lorenzo asserts that, if he could be found to have violated the provisions, the decision in *Janus* would effectively be rendered meaningless. *See SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). He notes the *Janus* Court's interest in interpreting the term "make" in a manner that would avoid undermining the Court's previous holding that private actions under Rule 10b-5 cannot be premised on conceptions of secondary (i.e., aiding-and-abetting) liability. *See Janus*, 564 U.S. at 143 (discussing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)).

As the Court explained in *Janus*, whereas the Commission can bring actions under Rule 10b-5 based on an aiding-and-abetting theory, private parties—after *Central Bank*—cannot. *Id.* The *Janus* Court reasoned that a "broader reading of 'make,'" encompassing "persons or entities without ultimate control over the content of a statement," could mean that "aiders and abettors would be almost

nonexistent." *Id.* That result, the Court believed, would have undercut an implicit understanding from *Central Bank*: that "there must be some distinction between those who are primarily liable . . . and those who are secondarily liable." *Id.* at 143 n.6. The same considerations, Lorenzo contends, should weigh in favor of concluding that his conduct did not violate Section 10(b), Rules 10b-5(a) and (c), and Section 17(a)(1). We are unpersuaded.

To the extent the *Janus* Court's concerns about aiding-and-abetting liability in private actions under Rule 10b-5(b) should inform our interpretation of those other four provisions, the conduct at issue in *Janus* materially differs from Lorenzo's actions in this case. *Janus* involved an investment adviser that initially drafted false statements which an independent entity subsequently decided to disseminate to investors in its own name. The investment adviser's role in originally devising the statements was unknown to the investors who ultimately received them. The Court thus described the investment adviser's conduct as "an undisclosed act preceding the decision of an independent entity to make a public statement." 564 U.S. at 145.

In this case, by contrast, Lorenzo's role was not "undisclosed" to investors. The recipients were fully alerted to his involvement: Lorenzo sent the emails from his account and under his name, in his capacity as director of investment banking at Charles Vista. While Gregg Lorenzo supplied the content of the false statements for inclusion in Lorenzo's email messages, Lorenzo effectively vouched for the emails' contents and put his reputation on the line by listing his personal phone number and inviting the recipients to "call with any questions." J.A. 794, 796. Nor did the dissemination of the false statements to investors result only from the separate "decision of an independent entity." *Janus*,

564 U.S. at 145. Lorenzo himself communicated with investors, directly emailing them misstatements about the debenture offering.

Unlike in *Janus*, therefore, the recipients of Lorenzo's emails were not exposed to the false information only through the intervening act of "another person." *Id.* For the same reasons, Lorenzo's conduct also differs from the actions considered in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008). There, the Supreme Court held that parties who allegedly played a role in a scheme to make false statements to investors could not be held liable in a private action under Rule 10b-5. The Court explained that the parties' acts "were not disclosed to the investing public" and they "had no role" in "disseminating" the misstatements in question. *Id.* at 155, 161. Lorenzo, unlike the defendants in *Janus* and *Stoneridge*, transmitted misinformation directly to investors, and his involvement was transparent to them.

As a result, insofar as the *Janus* Court declined to bring the investment adviser's actions in that case within the fold of Rule 10b-5 because doing so might reach too many persons fairly considered to be aiders and abettors, the same is not true of Lorenzo's distinct conduct in this case. The Court's concern that "aiders and abettors would be almost nonexistent" if a private action under Rule 10b-5 reached "an undisclosed act preceding the decision of an independent entity to make a public statement," *Janus*, 564 U.S. at 143, 145, need not obtain in the case of a person's self-attributed communications sent directly to investors (and backed by scienter). Lorenzo's actions thus can form the basis of a violation of Rules 10b-5(a) and (c) (as well as Sections 10(b) and 17(a)(1)) while still leaving ample room for "distinction between those who are primarily liable . . . and those who are

secondarily liable." *Id.* at 143 n.6; *see Stoneridge*, 552 U.S. at 166 ("[T]he implied right of action in § 10(b) continues to cover secondary actors who commit primary violations." (citing *Central Bank*, 511 U.S. at 191)).

3. Lorenzo intimates more broadly that actions involving false statements must fit within Rule 10b-5(b) and cannot be brought separately under Rules 10b-5(a) or (c) (or Section 17(a)(1)). We know of no blanket reason, however, to treat the various provisions as occupying mutually exclusive territory, such that false-statement cases must reside exclusively within the province of Rule 10b-5(b). And any suggestion that the coverage of Rule 10b-5(b) must be distinct from that of Rules 10b-5(a) and (c) presumably would mean that each of the latter two provisions likewise must occupy entirely separate ground from one another. In our view, however, the provisions' coverage may overlap in certain respects.

Significantly, the Supreme Court recently described Rule 10b-5 in a manner confirming that conduct potentially subject to Rule 10b-5(b)'s bar against making false statements can also fall within Rule 10b-5(a)'s more general prohibition against employing fraudulent devices: the Court explained that "Rule 10b-5 . . . forbids the use of any 'device, scheme, or artifice to defraud' (*including* the making of any 'untrue statement of material fact' or any similar 'omi[ssion]')." *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1063 (2014) (emphasis added).

The Court has also held that, although Section 14 of the Exchange Act establishes "a complex regulatory scheme covering proxy solicitations," the inapplicability of Section 14 to false statements in proxy materials does not preclude the application of Rule 10b-5 to the same statements. *SEC v.*

*Nat'l Sec., Inc.*, 393 U.S. 453, 468 (1969). "The fact that there may well be some overlap is neither unusual nor unfortunate," the Court explained. *Id.* Here, correspondingly, Rules 10b-5(a) and (c), as well as Sections 10(b) and 17(a)(1), may encompass certain conduct involving the dissemination of false statements even if the same conduct lies beyond the reach of Rule 10b-5(b).

In accordance with that understanding, a number of decisions have held that securities-fraud allegations involving misstatements can give rise to liability under related provisions even if the conduct in question does not amount to "making" a statement under *Janus*. *See, e.g.*, *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 795-96 (11th Cir. 2015); *SEC v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014); *SEC v. Benger*, 931 F. Supp. 2d 904, 905-06 (N.D. Ill. 2013); *SEC v. Familant*, 910 F. Supp. 2d 83, 93-95 (D.D.C. 2012); *SEC v. Stoker*, 865 F. Supp. 2d 457, 464-65 (S.D.N.Y. 2012). We reach the same conclusion here with respect to the role played by Lorenzo in disseminating the false statements in his email messages to investors.

4. Our dissenting colleague would find that Lorenzo's actions did not violate Rules 10b-5(a) or (c), or Sections 10(b) or 17(a)(1). He advances two reasons for reaching that conclusion, each of which, in our respectful view, is misconceived.

a. The dissent's central submission is that Lorenzo acted without any intent to deceive or defraud. As our colleague sees things, Lorenzo simply transmitted false statements supplied by Gregg Lorenzo without giving any thought to their content. *See infra* at 1, 6 (Kavanaugh, J., dissenting). And Lorenzo ostensibly paid no attention to the content of the statements he sent even though: he included the statements in

messages he produced for distribution from his own email account; he sent the statements in his name and capacity as investment banking director; and he encouraged the recipients to contact him personally with questions about the content. Under our colleague's understanding, that is, Lorenzo offered to answer any questions about his emails even though he had supposedly paid no attention to what they said.

In adopting that understanding, the dissent relies on a finding by the ALJ that Lorenzo sent the emails without thinking about their contents. But the Commission, as we have noted, rejected the ALJ's conclusion to that effect as "implausible" in the circumstances. *Lorenzo*, 2015 WL 1927763, at *9. In our colleague's view, the court should accept the ALJ's finding, notwithstanding the Commission's rejection of it, because the ALJ could assess Lorenzo's credibility as a witness.

The dissent's (and ALJ's) factual understanding, however, is contradicted by Lorenzo's own account of his mental state to this court. Lorenzo raises no challenge to the Commission's rejection of any notion that he paid no heed to his messages' content. What is more, his argument on the issue of scienter rests on his affirmative contemplation—indeed, his ratification—of the content of his emails.

Unlike in his arguments before the ALJ and Commission, Lorenzo, in this court, does not take the position that he simply passed along statements supplied by Gregg Lorenzo without thinking about them. Such a suggestion appears nowhere in his briefing. To the contrary, he argues that, "[a]t the time the email was sent [he] *believed the statements to be true* and he did not act with scienter." Pet'r Reply Br. 6 (emphasis added). He further asserts that he "*had a good faith belief in the veracity of the statements* contained in the

email that was drafted by Gregg Lorenzo." Pet'r Opening Br. 18 (emphasis added); *id.* at 22 ("Petitioner had a good faith belief in the accuracy of the statements contained in the email."). He then attempts to explain why he could have believed the truth of the materially misleading statements contained in his email messages, arguments that we have already rejected in affirming the Commission's findings of scienter. *See supra* Part II.

For present purposes, what matters is that a person cannot have "believed statements to be true" at the time he sent them, or possessed a "good faith belief in their veracity," if he had given no thought to their content in the first place. In that light, our dissenting colleague relies on an account of Lorenzo's state of mind that stands in opposition to Lorenzo's account to us of his own state of mind. (As for our colleague's theory that Lorenzo could have formed a belief about the statements' truthfulness without even reading them, based purely on his trust of Gregg Lorenzo, *see infra* at 7 n.1 (Kavanaugh, J., dissenting), even if we assume that theory were viable as a conceptual matter, Lorenzo's arguments to us about his belief in the statements' truth rest solely on their content, not on any trust-without-verifying level of confidence in Gregg Lorenzo's veracity. Indeed, he testified that, at least as of November 2009, "there is no way on God's green earth [he] thought Gregg Lorenzo was an honest guy." J.A. 176.)

Perhaps Lorenzo concluded he could not overcome the Commission's assessment that it would be implausible to suppose he had blinded himself to the statements' content before sending them to investors and offering to answer any questions about them. Or perhaps he determined that, insofar as he did so, he would have difficulty denying that he had acted with extreme recklessness—and therefore with scienter—in any event. Regardless, Lorenzo now takes the

position that he took stock of the content of the statements, so much so that he formed a belief as to their truthfulness. And we are in no position to embrace an understanding of Lorenzo's mental state that is disclaimed by Lorenzo himself.

To be clear, the point here is not that Lorenzo failed to preserve an argument about scienter. Lorenzo devoted considerable attention to the issue of scienter in his briefing. But Lorenzo's arguments on the issue contain no suggestion that he sent his emails without giving thought to their contents. He instead contends he *did* think about the contents (and reasonably believed them to be truthful). In those circumstances, we do not so much defer to the *Commission*'s assessment of Lorenzo's state of mind over the ALJ's finding that Lorenzo gave no thought to his emails' content. Rather, we accede to *Lorenzo*'s account of his own mental state, which is incompatible with the finding of the ALJ.

But what if Lorenzo in fact had sought to argue to us, in concert with the ALJ's finding, that he gave no thought to the content of his email messages when sending them? In that event—which, again, is not the situation we face—the issue for us would have been whether the Commission's contrary conclusion is supported by substantial evidence, not whether the Commission or the ALJ has the better of the dispute between them on the matter. *See, e.g.*, *Kay v. FCC*, 396 F.3d 1184, 1189 (D.C. Cir. 2005); *Swan Creek Communications, Inc. v. FCC*, 39 F.3d 1217, 1221 (D.C. Cir. 1994); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951).

The Commission's finding meets the deferential, substantial-evidence standard. After all, Lorenzo's emails marked the only time he communicated directly with prospective investors, the emails concerned a securities offering by his sole investment banking client, the emails said

he would personally answer questions about their content, and the emails carried his professional imprimatur as director of investment banking—all of which support the Commission's rejection of the idea that Lorenzo simply sent his emails without taking any stock of what they said.

b. Even accepting that Lorenzo thought about the statements in his emails and sent them with an intent to deceive, the dissent would still conclude that Lorenzo's conduct falls outside the ambit of Rules 10b-5(a) and (c), and Sections 10(b) and 17(a)(1). *See infra* at 9 (Kavanaugh, J., dissenting). Our colleague grounds that conclusion in his agreement with the proposition put forward by certain other courts of appeals to the effect that "scheme liability"—i.e., the conduct prohibited by Rules 10b-5(a) and (c)—requires something more than false or misleading statements. *See Pub. Pension Fund Grp. v. KV Pharma. Co.*, 679 F.3d 972, 987 (8th Cir. 2012); *WPP Luxembourg Gamma Three Sari v. Spot Runner, Inc.*, 655 F.3d 1039, 1057-58 (9th Cir. 2011); *Lentell v. Merill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).

Our colleague appears to read those decisions' embrace of that proposition to rest on the need to maintain a distinction between primary liability and secondary liability under Rule 10b-5. We have described the *Janus* Court's reliance on that concern and explained our conclusion that it does not carry the day in the specific circumstances of Lorenzo's conduct. *See supra* Part III.B.2.

Moreover, we do not read the referenced courts of appeals' decisions to rest on concerns about preserving a distinction between primary and secondary liability. None of those decisions discusses (or mentions) the concepts of primary and secondary liability or any need to maintain a

separation between them. Indeed, two of the three decisions postdate *Janus*, yet neither cites *Janus*, much less invokes *Janus*'s concerns with construing the scope of Rule 10b-5(b) in a manner that would encompass too many aiders-and-abettors.

In addition, it is far from clear that the rule articulated by those decisions could suitably be grounded in concerns with preserving a distinction between primary and secondary liability. According to the decisions, a "defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *WPP Luxembourg*, 655 F.3d at 1057; *see KV Pharma.*, 679 F.3d at 987; *Lentell*, 396 F.3d at 177. That understanding would be overinclusive if the objective in fact were to assure that aiders-and-abettors are not held primarily liable under those provisions.

Consider, for instance, the facts of *WPP Luxembourg*. There, the plaintiffs alleged sufficient facts to make out a claim of materially misleading omissions under Rule 10b-5(b). 655 F.3d at 1051. There was no question that the defendants faced primary (not secondary) liability if the facts as pleaded were proved. *Id.* Yet the court held that the defendants could not be liable under Rules 10b-5(a) or (c) because there were no allegations against them apart from misstatements or omissions. *Id.* at 1057-58. The court's requirement that plaintiffs prove more than misstatements thus barred liability under those provisions even though there could have been no concerns about blurring the distinction between primary and secondary liability. Perhaps it is unsurprising, then, that, while Lorenzo relies on the importance of maintaining the primary-secondary liability

distinction, he makes no reference to *WPP Luxembourg* or the other two decisions in his briefing.

For those reasons, we disagree with our dissenting colleague's suggestion that our holding conflicts with those decisions with regard to the primary-secondary liability distinction. *See infra* at 9 (Kavanaugh, J., dissenting). We do not understand those decisions to turn on that distinction.

Those decisions do generally state, however, that Rules 10b-5(a) and (c) require something more than misstatements. But they did not have occasion to elaborate on that understanding to any significant extent—including, importantly for purposes of this case, whether the same interpretation would extend to Section 17(a)(1). Insofar as those courts of appeals would find Lorenzo's actions to lie beyond the reach of those provisions, we read the provisions differently. Lorenzo's particular conduct, as we have explained, fits comfortably within the language of Rules 10b-5(a) and (c), along with that of Sections 10(b) and 17(a)(1).

Finally, we briefly respond to our dissenting colleague's belief that there is an incongruity in deciding both that Lorenzo was not a maker of the false statements under Rule 10b-5(b) and that he nonetheless employed a fraudulent device and engaged in a fraudulent act under Rules 10b-5(a) and (c) and Section 17(a)(1). *See infra* at 11 (Kavanaugh, J., dissenting). Those combined decisions, in our view, follow naturally from the terms of the provisions. Lorenzo was not the "maker" of the false statements because he lacked ultimate authority over them. Still, he "engaged" in a fraudulent "act" and "employed" a fraudulent "device" when, with knowledge of the statements' falsity and an intent to deceive, he sent the statements to potential investors carrying his stamp of approval as investment banking director. One

can readily imagine persons whose ministerial acts in connection with false statements would fail to qualify either as "making" the statements or as "employing" any fraudulent device. Lorenzo, in our view, is not such a person.

IV.

Lorenzo's final challenge concerns the sanctions imposed against him. The Commission permanently barred Lorenzo "from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization and from participating in an offering of penny stocks." *Lorenzo*, 2015 WL 1927763, at *17. The Commission also ordered him to pay a $15,000 monetary penalty. Lorenzo argues that those penalties are arbitrary and capricious for various reasons, including that they are disproportional to the severity of his misconduct and to the sanctions imposed in similar cases.

We decline to reach the merits of Lorenzo's challenges. The Commission chose the level of sanctions based in part on a misimpression that Lorenzo was the "maker" of false statements in violation of Rule 10b-5(b). Because we have now overturned the Commission's finding of liability under Rule 10b-5(b), we vacate the sanctions and remand the matter to enable the Commission to reconsider the appropriate penalties.

We have no assurance that the Commission would have imposed the same level of penalties in the absence of its finding of liability for making false statements under Rule 10b-5(b). The Commission expressly grounded its sanctions on its perceptions about the "egregiousness of Lorenzo's conduct" and the "degree of scienter involved," as well as the

need to deter others "from engaging in similar misconduct." *Id.* at \*12, \*14. But the Commission operated under the assumption that Lorenzo devised, and had ultimate authority over, the substance of the false statements contained in the email messages he sent to investors. That assumption, as we have concluded, is unsupported by the record evidence. The Commission in fact specifically based its sanctions in some measure on a belief that Lorenzo improperly sought to "shift blame" by asserting "that he sent the emails at Gregg Lorenzo's direction." *Id.* at \*13. But as the record indicates, that is essentially what happened.

Because we "cannot be certain what role, if any," the Commission's misperception that Lorenzo was the "maker" of the false statements ultimately played in its choice of sanctions, "we must remand" to enable it to reassess the appropriate penalties. *Alliance for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940-41 (D.C. Cir. 1991). When the Commission does so under a correct understanding about the nature of Lorenzo's misconduct, it can assess "whether the sanction is out of line with the agency's decisions in other cases" involving comparable misconduct—which, as we have observed, is one consideration informing review of penalties for arbitrariness and capriciousness. *Collins v. SEC*, 736 F.3d 521, 526 (D.C. Cir. 2013).

The Commission, in this regard, notes our previous observation that the "Commission is not obligated to make its sanctions uniform, so we will not compare this sanction to those imposed in previous cases." *Geiger v. SEC*, 363 F.3d 481, 488 (D.C. Cir. 2004) (citing *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 186-87 (1973)). In that vein, we have explained that a mere absence of uniformity will not necessarily render a particular action "unwarranted in law," *id.* at 488, or "unwarranted as a matter of policy," *Kornman*,

592 F.3d at 188. But we have never declined to compare past-and-present Commission sanctions in the context of an arbitrary-and-capricious challenge. In fact, our decision in *Collins* clarified that such a challenge may be brought to review the propriety of the Commission's choice of sanction in a given case as compared with sanctions in comparable situations. *See* 736 F.3d at 526.

\* \* \* \* \*

For the foregoing reasons, we grant the petition for review in part, vacate the sanctions imposed by the Commission, and remand the matter for further consideration.

*So ordered.*

KAVANAUGH, *Circuit Judge*, dissenting: Suppose you work for a securities firm. Your boss drafts an email message and tells you to send the email on his behalf to two clients. You promptly send the emails to the two clients without thinking too much about the contents of the emails. You note in the emails that you are sending the message "at the request" of your boss. It turns out, however, that the message from your boss to the clients is false and defrauds the clients out of a total of $15,000. Your boss is then sanctioned by the Securities and Exchange Commission (as is appropriate) for the improper conduct.

What about you? For sending along those emails at the direct behest of your boss, are you too on the hook for the securities law violation of *willfully* making a false statement or *willfully* engaging in a scheme to defraud?

According to the SEC, the answer is yes. And the SEC concludes that your behavior – in essence forwarding emails after being told to do so by your boss – warrants a *lifetime suspension* from the securities profession, on top of a monetary fine.

That is what happened to Frank Lorenzo in this case. The good news is that the majority opinion vacates the lifetime suspension. The bad news is that the majority opinion – invoking a standard of deference that, as applied here, seems akin to a standard of "hold your nose to avoid the stink" – upholds much of the SEC's decision on liability. I would vacate the SEC's conclusions as to both sanctions and liability. I therefore respectfully dissent.

\* \* \*

The SEC initiated an enforcement action against Frank Lorenzo and his boss. The boss eventually reached a settlement agreement with the SEC. Apparently thinking he

had done little wrong by merely sending emails to two clients at the request of his boss, Lorenzo did not settle.

The case then proceeded through three stages: a trial before an SEC administrative law judge, review by the Commission itself, and then review by this Court. To understand my disagreement with the majority opinion, it is necessary to describe all three acts in this drama.

## Act One: The Administrative Law Judge

The case proceeded to trial before an administrative law judge. This was not your usual trial. Surprisingly, the SEC did not present testimony from Lorenzo's boss or from anyone else at the securities firm where Lorenzo worked. Instead, only Lorenzo testified about the extent of his involvement in drafting and sending the emails.

After hearing Lorenzo's testimony and weighing his credibility, the judge concluded that Lorenzo's boss had "drafted" the emails in question and that Lorenzo's boss had "asked" Lorenzo to send the emails to two clients. ALJ Op. at 5 (Dec. 31, 2013), J.A. 906. The judge also concluded that Lorenzo did not read the text of the emails and that Lorenzo "sent the emails without even thinking about the contents." *Id.* at 7, J.A. 908; *see id.* at 9, J.A. 910 ("Had he taken a minute to read the text . . ."). Furthermore, the judge noted that the emails themselves expressly stated that they were being sent at "the request" of Lorenzo's boss. *Id.* at 5, J.A. 906.

Those factual findings were very favorable to Lorenzo and should have cleared Lorenzo of any serious wrongdoing under the securities laws. At most, the judge's factual findings may have shown some mild negligence on Lorenzo's part. The judge, however, went much further than that. The judge

somehow concluded that those findings of fact demonstrated that Lorenzo *willfully* violated the securities laws – meaning that Lorenzo acted with an intent to deceive, manipulate, or defraud. (A finding of willfulness, as opposed to a finding of negligence, matters because it subjects a defendant to much higher penalties.) As a sanction, the judge not only fined Lorenzo, but also imposed a *lifetime suspension* that prevents Lorenzo from ever again working in the securities industry.

The administrative law judge's factual findings and legal conclusions do not square up. If Lorenzo did not draft the emails, did not think about the contents of the emails, and sent the emails only at the behest of his boss, it is impossible to find that Lorenzo acted "willfully." That is Mens Rea 101. Establishing that a defendant acted willfully in this context requires proof at least of the defendant's "intent to deceive, manipulate, or defraud." *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008) (internal quotation marks omitted). How could Lorenzo have intentionally deceived the clients when he did not draft the emails, did not think about the contents of the emails, and sent the emails only at his boss's direction?

The administrative law judge's decision in this case contravenes basic due process. A finding that a defendant possessed the requisite mens rea is essential to preserving individual liberty. *See, e.g.*, *Morissette v. United States*, 342 U.S. 246, 250-51, 263 (1952); *see also United States v. Burwell*, 690 F.3d 500, 527 (D.C. Cir. 2012) (en banc) (Kavanaugh, J., dissenting); *United States v. Moore*, 612 F.3d 698, 703 (D.C. Cir. 2010) (Kavanaugh, J., concurring); *Bluman v. FEC*, 800 F. Supp. 2d 281, 292 (D.D.C. 2011) (three-judge panel). As Justice Jackson explained: "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and

persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to.'" *Morissette*, 342 U.S. at 250-51 (footnote omitted).

The administrative law judge's opinion in this case did not heed those bedrock mens rea principles. Given the judge's pro-Lorenzo findings of fact, a legal conclusion that Lorenzo "willfully" violated the securities laws makes a hash of the term "willfully," and of the deeply rooted principle that punishment must correspond to blameworthiness based on the defendant's mens rea.

### Act Two: The Securities and Exchange Commission

Fast forward to the Securities and Exchange Commission, which heard the appeal of the administrative law judge's decision. Surely the Commission would realize that the administrative law judge's factual findings did not support the judge's legal conclusions and sanctions?

And indeed, the Commission did come to that realization. But instead of vacating the order against Lorenzo, the Commission did something quite different and quite remarkable. In a Houdini-like move, the Commission rewrote the administrative law judge's factual findings to make those factual findings correspond to the legal conclusion that Lorenzo was guilty and deserving of a lifetime suspension.

Recall what the administrative law judge found: that Lorenzo's boss "drafted" the emails, that Lorenzo did not think about the contents of the emails, and that Lorenzo sent the

emails only after being asked to do so by his boss. ALJ Op. at 5, J.A. 906. The judge reached those conclusions only after hearing Lorenzo testify and assessing his credibility in person.

Without hearing from Lorenzo or any other witnesses, the Commission simply swept the judge's factual and credibility findings under the rug. The Commission concluded that Lorenzo himself was "responsible" for the emails' contents. *In the Matter of Francis V. Lorenzo*, Securities Act Release No. 9762, Exchange Act Release No. 74836 at 16 (Apr. 29, 2015), J.A. 930. How did the Commission magically explain its decision to discard the administrative law judge's findings of fact? Easy. In a footnote, the Commission said that it did not need to "blindly" accept the administrative law judge's factual findings and credibility judgments. *Id.* at 16 n.32, J.A. 930 n.32. Voila.

The Commission's handiwork in this case is its own debacle. Faced with inconvenient factual findings that would make it hard to uphold the sanctions against Lorenzo, the Commission – without hearing any testimony – simply manufactured a new assessment of Lorenzo's credibility and rewrote the judge's factual findings. So much for a fair trial.

### Act Three: This Court

Fast forward to this Court. To its credit, the majority opinion rightly concludes that Lorenzo did not "make" the statements in the emails for purposes of Rule 10b-5(b) liability. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). And the majority opinion, also to its credit, vacates the grossly excessive lifetime suspension of Lorenzo and sends the case back to the SEC for reconsideration of the appropriate penalties.

So far, so good. But applying what it calls "very deferential" review, the majority opinion upholds the finding of liability against Lorenzo under Section 10(b), Rule 10b-5(a) and (c), and Section 17(a). Maj. Op. 7, 18-25. The majority opinion does so on the ground that Lorenzo willfully engaged in a scheme to defraud even though he did not "make" the statements in the emails.

I disagree on two alternative and independent grounds with the majority opinion's merits analysis.

*First*, the majority opinion does not heed the administrative law judge's factual conclusions, which were based on the judge's in-person assessment of Lorenzo's testimony at trial. Those factual conclusions demonstrate that Lorenzo lacked the necessary mens rea of willfulness.

To show that Lorenzo willfully engaged in a scheme to defraud, the SEC had to prove that Lorenzo acted with an intent to deceive, manipulate, or defraud. But recall that, as findings of fact, the administrative law judge concluded (after hearing Lorenzo testify) that Lorenzo did not draft the emails, did not think about the contents of the emails, and sent the emails only at the behest of his boss.

In light of the administrative law judge's factual findings, how can Lorenzo be deemed to have willfully engaged in a scheme to defraud? The majority opinion says that the facts found by the administrative law judge are not the right facts. Instead, in reaching its conclusion, the majority opinion relies on the SEC's alternative facts, which the SEC devised on its own without hearing from any witnesses. *See* Maj. Op. 20-21,

26-29 (adopting the SEC's view of the facts over the administrative law judge's view).[1]

It is true that, under certain circumstances, an agency such as the SEC may re-examine and overturn an administrative law judge's factual findings. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492 (1951). But an agency does not have carte blanche to rewrite an administrative law judge's factual determinations. Rather, an agency must act reasonably when it disregards an administrative law judge's factual findings, a point the SEC's attorney expressly acknowledged at oral argument. *See* Tr. of Oral Arg. at 28. It is black-letter law, therefore, that "a contrary initial decision" by an administrative law judge "may undermine the support for the agency's ultimate determination." Ronald M. Levin & Jeffrey S. Lubbers, *Administrative Law and Process* 101 (6th ed. 2017).

---

[1] The majority opinion also says that Lorenzo, in his briefing here, does not describe his own state of mind in the way that the administrative law judge did. In other words, the majority opinion says that Lorenzo accepts the SEC's reconstruction of the facts. I disagree. To be sure, Lorenzo advances the alternative argument that he should prevail even if the SEC's reconstruction of the facts is correct. But Lorenzo certainly does not agree with or accept the SEC's reconstruction.

Moreover, in making this point, the majority opinion draws a dichotomy between Lorenzo's good-faith belief (as noted in his briefs) in the accuracy of the emails and Lorenzo's statement that he did not think about the contents of the email. That is a false dichotomy. When forwarding an email on behalf of your boss, you could have a good-faith belief in its accuracy because you trust your boss, or at least have no reason to delve deeply into the particulars of the email's contents, not because you have necessarily read or independently verified the contents of the email. The majority opinion notes that Lorenzo, "as of November 2009," did not trust his boss. Maj. Op. 27. But that date is of course *after* the events at issue in this case.

And here is the key principle that speaks directly to this case: "When the case turns on eyewitness testimony . . . the initial decision should be given considerable weight: the ALJ was able to observe the demeanor of the witnesses and assess their credibility and veracity first hand." *Id.*

In my view, the majority opinion misapplies those black-letter principles. Contrary to the majority opinion's acceptance of the SEC's reconstruction of the facts in this case, I would conclude that the SEC's rewriting of the administrative law judge's findings of fact was utterly unreasonable and should not be sustained or countenanced by this Court. Given that Lorenzo was the only relevant witness at trial (dwell again on that point for a few moments) and given that his credibility was central to the case, the SEC had no reasonable basis to run roughshod over the administrative law judge's findings of fact and credibility assessments. In short, the SEC's rewriting of the findings of fact deserves judicial repudiation, not judicial deference or respect.

Instead of deferring to the SEC's creation of an alternative factual record, as the majority opinion does, we should examine the administrative law judge's underlying findings of fact and ask whether *those findings* suffice to support the conclusion that Lorenzo willfully engaged in a scheme to defraud. The answer to that question, as explained above, is a clear no.[2]

---

[2] At oral argument, counsel for the SEC actually stated that it would have been "more difficult" for the SEC to find Lorenzo liable if Lorenzo's email had said that it was being sent "on behalf of" his boss instead of "at the request of" his boss. Counsel for the SEC asserted that those two phrases were "meaningfully different." Tr. of Oral Arg. at 30. With respect, I find that argument absurd and an illustration of how the Commission jumped the rails in this case. It is startling that the SEC thinks such a wafer-thin semantic distinction

*Second*, put that aside.  Even if I am wrong about the first point, the majority opinion still suffers from a separate flaw, in my view.

The majority opinion creates a circuit split by holding that mere misstatements, standing alone, may constitute the basis for so-called scheme liability under the securities laws – that is, willful participation in a scheme to defraud – even if the defendant did not make the misstatements.[3]  No other court of appeals has adopted the approach that the majority opinion adopts here.  Other courts have instead concluded that scheme liability must be based on conduct that goes beyond a defendant's role in preparing mere misstatements or omissions made by others.  *See, e.g.*, *Public Pension Fund Group v. KV Pharmaceutical Co.*, 679 F.3d 972, 987 (8th Cir. 2012); *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); *see also SEC v. Kelly*, 817 F. Supp. 2d 340, 343-44 (S.D.N.Y. 2011).  Otherwise, the SEC would be able to evade the important statutory distinction between primary liability and secondary (aiding and abetting) liability.  After all, if those who aid and abet a misstatement are themselves primary violators for engaging in a scheme to defraud, what would be the point of the distinction between primary and secondary liability?

The distinction between primary and secondary liability matters, particularly for private securities lawsuits.  For decades, however, the SEC has tried to erase that distinction so

---

can make the difference between (i) a lifetime suspension from your chosen profession and (ii) no penalty at all.

[3] On page 31, the majority opinion ultimately appears to acknowledge the circuit split:  "Insofar as those courts of appeals would find Lorenzo's actions to lie beyond the reach of those provisions, we read the provisions differently."

as to expand the scope of primary liability under the securities laws. For decades, the Supreme Court has pushed back hard against the SEC's attempts to unilaterally rewrite the law. *See Janus*, 564 U.S. 135; *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.* 552 U.S. 148 (2008); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). Still undeterred in the wake of that body of Supreme Court precedent, the SEC has continued to push the envelope and has tried to circumvent those Supreme Court decisions. *See, e.g., In the Matter of John P. Flannery & James D. Hopkins*, Release No. 3981 (Dec. 15, 2014). This case is merely the latest example.[4]

I agree with the other courts that have rejected the SEC's persistent efforts to end-run the Supreme Court. I therefore respectfully disagree with the majority opinion that Lorenzo's role in forwarding the alleged misstatements made by Lorenzo's boss can be the basis for scheme liability against Lorenzo.

---

[4] In this case, the SEC relied on its prior decision in *Flannery*. But as one respected commentator persuasively explained, the SEC's *Flannery* decision is wrong. "The substantive concern is that the Commission defined primary liability under portions of the major anti-fraud provisions in expansive ways that disregarded the reasoning and rationale of the Supreme Court and some courts of appeals. The Supreme Court has sought to clarify the distinction between primary and secondary liability under Rule 10b-5, yet the Commission's *Flannery* decision all but eradicated the distinction and committed the same error with Section 17(a). It sought to regain the ground on primary liability that was lost in *Stoneridge* and *Janus* and then went further with novel constructions of primary liability based on lawful, non-deceptive actions or exorbitant doctrines of but-for causality." Andrew N. Vollmer, *SEC Revanchism and the Expansion of Primary Liability Under Section 17(a) and Rule 10b-5*, 10 VA. L. & BUS. REV. 273, 340 (2016).

Taking a step back on the scheme liability point, moreover, think about the oddity of the majority opinion's combined legal rulings today. The majority opinion emphatically holds that Lorenzo did not "make" the statements in the emails. In reaching that conclusion, the majority opinion accurately says that "Lorenzo transmitted statements devised by" Lorenzo's boss at his boss's "direction." Maj. Op. 16. The majority opinion also correctly notes that Lorenzo's boss "asked Lorenzo to send the emails, supplied the central content, and approved the messages for distribution." Maj. Op. 17. At the same time, however, the majority opinion emphatically holds that Lorenzo nonetheless willfully engaged in a scheme to defraud solely because of the statements made by his boss. That combined holding makes little sense (at least to me) under the facts of this particular case. Nor does it make much sense under the law, which is presumably why the other courts of appeals have rejected that kind of legal jujitsu. In these circumstances, perhaps the alleged offender (here, Lorenzo) could have been charged with aiding and abetting, if the relevant mens rea requirements for aiding and abetting liability were met. But Lorenzo may not be held liable as a primary violator, in my view.

\* \* \*

Administrative adjudication of individual disputes is usually accompanied by deferential review from the Article III Judiciary. That agency-centric process is in some tension with Article III of the Constitution, the Due Process Clause of the Fifth Amendment, and the Seventh Amendment right to a jury trial in civil cases. *See generally* PHILIP HAMBURGER, IS ADMINISTRATIVE LAW UNLAWFUL? 227-57 (2014). That tension is exacerbated when, as here, the agency's political appointees – without hearing from any witnesses – disregard an administrative law judge's factual findings. That said, the

Supreme Court has allowed administrative adjudication ever since *Crowell v. Benson*, 285 U.S. 22 (1932). But the premise of *Crowell v. Benson* is that, putting aside any formal constitutional problems with the notion of administrative adjudication, the administrative adjudication process will at least operate with efficiency and with fairness to the parties involved. This case, among others, casts substantial doubt on that premise.

Securities brokers such as Frank Lorenzo obviously do not tug at the judicial heartstrings. And maybe Lorenzo really is guilty of negligence (or worse). But before the SEC reaches such a conclusion, Lorenzo is entitled to a fair process just like everyone else. *Cf. United States v. Burwell*, 690 F.3d 500, 527 (D.C. Cir. 2012) (en banc) (Kavanaugh, J., dissenting). He has not received a fair process in this case.

I hope that the SEC on remand pays attention, comes to its senses, and (at a minimum) dramatically scales back the sanctions in this case. Indeed, notwithstanding the majority opinion, I hope that the SEC, on its own motion, goes further than that: The SEC should vacate the order against Lorenzo in its entirety and either end this case altogether or (if appropriate and permissible) fairly start the process anew before the administrative law judge.

I firmly disagree with the majority opinion's decision to sustain the SEC's findings of liability under Section 10(b), Rule 10b-5(a) and (c), and Section 17(a). I respectfully dissent.